# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

LEHMAN BROTHERS HOLDINGS INC.,

      Plaintiff,

v.

LENDINGTREE, LLC and
LENDINGTREE, INC.

      Defendants.

Court File No.

**COMPLAINT**

---

Plaintiff Lehman Brothers Holdings Inc. ("LBHI" or "Plaintiff"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), by and through its attorneys, for its Complaint against LendingTree, Inc. ("LendingTree Parent") and LendingTree, LLC ("LendingTree Sub" and with LendingTree Parent, the "Defendants"), alleges with knowledge as to itself and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.    This action seeks to establish the liability of Defendants LendingTree Parent and LendingTree Sub for the substantial damages caused by the selling of defective mortgage loans through LendingTree Sub's wholly owned subsidiary, Home Loan Center, Inc. ("HLC") to LBHI. Defendants controlled HLC at all relevant times, and reaped substantial profits from its activities. Defendant LendingTree

Parent expressly assumed all relevant liabilities of HLC, and thus is liable as its successor.  Moreover, Defendants are liable as alter egos of HLC.

2.      In this action, LBHI now seeks to enforce an allowed claim[1] for contractual indemnification for liabilities, losses, damages, claims, judgments, and any other costs, fees, and expenses LBHI incurred as a result of HLC's sale and/or submission of defective mortgage loans in breach of HLC's representations, warranties, obligations, and/or covenants and/or for which LBHI incurred liability due to HLC's acts, failures to act and/or omissions (the "Defective Loans") against the bankruptcy estate.

3.      LBHI sold the Defective Loans to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and/or various RMBS trusts under agreements that included representations and warranties about the Defective Loans that were coextensive with those made by HLC.  LBHI retained the right to seek indemnification from HLC in the event it became liable for certain indemnification events.  After Fannie Mae, Freddie Mac, and the relevant RMBS trustees discovered that the mortgage loans breached certain of those representations and warranties, they made claims upon LBHI for losses suffered on the Defective Loans.  In January and February 2014, respectively, the United States Bankruptcy Court for the Southern District of New

---

[1] The order allowing the claim is expected to be entered imminently.

York (the "<u>Bankruptcy Court</u>") approved settlements between (i) LBHI and Fannie Mae (ECF No. 42153), and (ii) LBHI and Freddie Mac (ECF No. 42754).  On March 15, 2018, the Bankruptcy Court entered an Order Estimating Claim Pursuant to RMBS Settlement, resolving a majority of the RMBS trustee claims.  LBHI also settled several other RMBS trustee claims in the ordinary course.  These settlements triggered LBHI's indemnification claims under the Agreements, as defined below, with HLC.

4.      In December 2013, ResCap Liquidating Trust ("<u>ResCap</u>") sued HLC for losses and liabilities incurred based on the defective loans that HLC sold to ResCap's predecessor, Residential Funding Company, LLC ("<u>RFC</u>").  A jury found HLC liable in November 2018, and this Court entered judgment against HLC for approximately $68.5 million in June 2019.  Within a month after the June 2019 judgment, however, HLC filed for bankruptcy, claiming that it did not have resources left even to bond the appeal.

5.      At the time HLC filed for bankruptcy, it was defending an adversary proceeding for indemnification brought by LBHI before the Bankruptcy Court.  As that proceeding was stayed by HLC's bankruptcy filing, LBHI filed a proof of claim in HLC's bankruptcy case.  LBHI and the Chapter 7 Trustee for HLC settled the claim for a liquidated amount of $13.3 million (the "<u>Allowed Claim</u>").  The order allowing

3

the claim is expected to be signed and entered imminently, constituting an enforceable judgment on the part of LBHI against the HLC estate.

6.     However, HLC's obligations to LBHI, as fixed in the Allowed Claim, are enforceable against Defendants as well.  By way of background, in May 2003, LendingTree Sub (then known as LendingTree, Inc.) entered into an Agreement and Plan of Merger with IAC/InterActiveCorp (then known as USA Interactive) ("IAC") and Forest Merger Corp., pursuant to which IAC acquired full ownership of LendingTree Sub.  LendingTree Sub changed its name to Tree, LLC in December 2004.

7.     In 2004, LendingTree Sub acquired HLC, a residential mortgage loan originator that was incorporated in California.  HLC operated as a wholly owned subsidiary of LendingTree Sub, which in turn is now a wholly owned subsidiary of LendingTree Parent.  At all relevant times, both LendingTree Sub and HLC were controlled by Douglas Lebda, who was also the founder of the "LendingTree" business and is the chairman and chief executive officer of LendingTree Parent.

8.     Following the acquisition, LendingTree Sub controlled every aspect of HLC's business.  It caused HLC to source mortgage loans from LendingTree's family of websites under the "LendingTree Loans" name.  Moreover, it caused HLC to continue to sell loans to purchasers in the secondary market, including to LBHI.  In

addition, Defendants also guaranteed the funding critical to the LendingTree Loans business.

9.     In August 2008, LendingTree Sub spun off from IAC (the "Spin-Off"). As part of the Spin-Off, Defendant LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub.  LendingTree Parent expressly agreed to assume HLC's liabilities, including those related to "LendingTree Loans."

10.     By 2011, HLC faced a growing number of repurchase demands from purchasers based on misrepresentations it had made concerning the credit quality of mortgage loans it had sold in the secondary market.  In response to this growing liability, Defendants caused HLC to sell all of its operating assets, rendering it a mere shell that would conduct no further business, and whose principal activity would be distributing cash to Defendants and defending the claims for which Defendants were co-liable.

11.     In late 2013, RFC filed a complaint against HLC in Minnesota state court, bringing claims for breach of contract and contractual indemnification in connection with the defective loans sold to RFC in the secondary market.  The action was removed to this Court in 2014, and ResCap was substituted for RFC as the plaintiff.  LBHI filed an adversary proceeding against HLC in the Bankruptcy Court in December 2016.

12.     Defendants caused HLC to litigate the claims against it, including by LBHI, for several years.  During that time, the majority of HLC's cash was distributed to Defendants or spent on professional fees defending those litigations.  While the HLC litigations were ongoing, Defendants paid numerous lawyers and other professionals in connection with the contemplated bankruptcy of HLC.  HLC did not inform LBHI or the Bankruptcy Court that HLC did not have adequate funds to pay any judgment.  Instead, just one month after entry of ResCap's judgment against HLC for approximately $68.5 million, HLC filed for bankruptcy, for the first time disclosing that it had no more than approximately $5.4 million in cash remaining.

13.     Defendants, however, cannot escape the fact that LendingTree Parent expressly assumed all of HLC's relevant liabilities, including LBHI's Allowed Claim, and controlled and profited handsomely from HLC, before HLC became an empty shell and ultimately filed for bankruptcy.

14.     By this action, LBHI seeks to enforce its $13.3 million Allowed Claim against Defendants.

## PARTIES

15.     On September 15, 2008, Plaintiff LBHI commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  LBHI is a Delaware corporation with its principal place of business in New York, New York.

16.     Defendant LendingTree Sub is a Delaware limited liability company with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277.  LendingTree Sub was originally incorporated as LendingTree, Inc. in June 1996.  In May 2003, LendingTree Sub entered into an Agreement and Plan of Merger with IAC and Forest Merger Corp., pursuant to which IAC acquired all of LendingTree Sub's stock.  LendingTree Sub converted to Tree, LLC in December 2004, and is now called LendingTree, LLC.

17.     In August 2008, LendingTree Sub spun off from IAC.  As part of that transaction, Defendant LendingTree Parent was incorporated as a publicly traded company named Tree.com, Inc. and became the parent of LendingTree Sub. Tree.com, Inc. subsequently changed its name to Tree, Inc., and is now called LendingTree, Inc.

18.     Defendant LendingTree Parent is a publicly traded corporation incorporated in Delaware with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277.

19.     LendingTree Parent is the sole member of LendingTree Sub. LendingTree Sub is the sole shareholder of HLC and owns 100% of HLC's stock. Lebda is the chief executive officer, chairman of the board, and a shareholder of LendingTree Parent, the sole manager of LendingTree Sub, and until February 2019,

was the sole director of HLC. In February 2019, Lebda appointed Kyle Everett of Development Specialists, Inc. as HLC's sole director.

20.     Non-party HLC is a California corporation with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277. HLC is a second-generation Internet-based direct mortgage lender that was incorporated in California in September 2000 under the name FreeApprovalFinder.com, Inc. It changed its name to Home Loan Center, Inc. on March 8, 2002. HLC sold substantially all of its operating assets to Discover Bank ("Discover") in 2012. However, Tree.com, Inc. (now LendingTree Parent) kept all pre-closing liabilities and repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans. Since 2012, HLC has conducted no new business, and its principal and essentially only activity has been the litigation of claims arising from its origination of residential mortgage loans. On July 21, 2019, HLC filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California.[2] On September 16, 2019, HLC's chapter 11 case was converted into a chapter 7 case, and its estate is currently in liquidation.

21.     LBHI brought an adversary proceeding against HLC in December 2016 in the United States Bankruptcy Court for the Southern District of New York for

---

[2] For the avoidance of doubt, this Complaint does not name HLC as a party, nor does it assert any claim against or seek any relief from HLC or its bankruptcy estate. Nor does this Complaint assert any claims of or on behalf of HLC or its bankruptcy estate, or any trustee or debtor in possession in HLC's bankruptcy case.

breach of contract and indemnification in connection with HLC's sale of defective mortgage loans to LBHI in the secondary market.

22.     Non-party Douglas Lebda is an individual who, on information and belief, is and has been a resident of North Carolina at all times relevant to this Complaint.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) because it is related to LBHI's chapter 11 bankruptcy case, in that LBHI brings this claim as Plan Administrator to recover amounts owed to the Estate, which currently remains in administration.

24.     Defendants consented to personal jurisdiction before the courts in Minnesota, including this Court, by appointing an agent for receipt of service of process in Minnesota.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (i) all defendants are subject to the Court's personal jurisdiction and, thus, reside in this District for purposes of venue, (ii) the cause of action arose, in part, in Minnesota, since certain of the mortgage loans sold to LBB originated in Minnesota, (iii) Defendant LendingTree Parent expressly assumed all repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans, and (iv) litigating the case in this Court would be convenient for the parties and witnesses because the case *ResCap Liquidating Trust v. LendingTree, LLC and LendingTree,*

*Inc.*, Court File No. 19-cv-02360, that is pending before this Court is substantially identical to this action, in that both actions seek to enforce HLC's fixed indemnification liabilities for defective mortgage loans against Defendants in their capacity as successors, alter egos, and/or principals of HLC. Laying venue in this District would promote efficiency and coordination, and it would obviate the risk of inconsistent judgments.

**FACTUAL BACKGROUND**

**A.  LendingTree acquired HLC and subsequently controlled its operations.**

26.    HLC, then FreeApprovalFinder.com, was incorporated in California in 2000 and was headquartered in Irvine, California. It changed its name to Home Loan Center, Inc. on March 8, 2002. HLC made mortgage loans directly to consumers as the industry's first full spectrum online retail mortgage lender. It was a top ten online direct lender, approved in all 50 states.

27.    In September 2004, LendingTree Sub (then LendingTree, Inc.) entered into an agreement to acquire all of HLC's outstanding stock. The transaction was completed in December 2004. After LendingTree Sub acquired HLC, LendingTree Sub operated its lending business through HLC. The business consisted of originating mortgage loans and selling those loans to secondary market purchasers, including LBHI's affiliates.

28.     LendingTree Sub controlled every aspect of HLC's business and exploited HLC for its own gain.  LendingTree Sub's domination and exploitation of HLC is demonstrated by, among other things, the following:

a.  LendingTree Sub operated HLC under the brand name "LendingTree Loans," and HLC did business as "LendingTree Loans."

b.  HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans."  "LendingTree Loans"-branded loan originations were primarily sourced from consumer loan requests received by the LendingTree family of websites and phone platforms.

c.  Most of HLC's customer leads were generated by the LendingTree network and originated under the name "LendingTree Loans."

d.  Only a small portion of HLC's customer leads were sourced from non-LendingTree channels, such as third-party lead aggregators, direct mail marketing campaigns, and HLC's own website.  HLC only used its own brand name—Home Loan Center—when offering loans through third-party resources.

e.  LendingTree Sub funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.

f.  LendingTree Sub would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days.

**B.   Defendants expressly assumed all of HLC's liabilities.**

29.    In May 2003, LendingTree Sub (then LendingTree, Inc.) entered into an Agreement and Plan of Merger with IAC, pursuant to which IAC acquired all of LendingTree Sub's stock.

30.    In August 2008, LendingTree Sub spun off from IAC.  As part of the Spin-Off, LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub.  In addition, as part of the Spin-Off, Defendant LendingTree Parent expressly agreed to assume all of HLC's liabilities, including those related to "LendingTree Loans."

31.    In a 2008 S-1 filing following the Spin-Off, LendingTree Parent (then Tree.com, Inc.) disclosed (at page F-32) that "Tree.com will assume all of the liabilities related to the Tree.com Businesses," and defined "Tree.com Businesses" as "LendingTree Loans," which was the dba for HLC (at 58-59).  A copy of the 2008 S-1 is attached as Exhibit 1.

32.    In the same 2008 S-1 filing (at page 58), LendingTree Parent stated that its financial statements and disclosures "reflect the contribution or other transfer to Tree.com of all the subsidiaries and assets ***and the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses*** in connection with the spin-off" (emphasis added).

33.     The Separation and Distribution Agreement implementing the Spin-Off confirms that LendingTree Parent assumed all of HLC's liabilities relating to LendingTree Loans.  That agreement is attached as Exhibit 2.

34.     That agreement provides, in section 2.03(b), that:  "Each Spinco agrees to accept, assume and faithfully perform, discharge and fulfill all of its Corresponding Liabilities . . . ."  "Spinco" was defined (at 1) to include "Tree Spinco," which is LendingTree Parent (then Tree.com, Inc.).  "Corresponding Liabilities" was defined (at 6) as "with respect to Tree Spinco, any Tree Entity or the Tree Group . . . the Tree Liabilities."

35.     Section 2.10(g) defined "Tree Liabilities" as including "any Liability of a Spun Entity, whether arising or accruing prior to, on or after the Effective Time . . . shall be a Corresponding Liability of such Spun Entity's Corresponding Group."  Section 2.10(h) defined "Tree Liabilities" to include "any Liability relating to, arising out of, or resulting from the conduct of, a Spun Business . . . whether arising or accruing prior to, on or after the Effective Time and whether the facts on which it is based occurred on, prior to or after the Effective Time . . . shall be a Corresponding Liability of such Spun Business' Corresponding Group."

36.     "Corresponding Group" means "with respect to the Lending and Real Estate Business . . . the Tree Group."  *Id.* at 5.  "Tree Group" means Tree Spinco, the

Tree Entities, and each other person "that is a direct or indirect Subsidiary of Tree Spinco . . . ." *Id.* at 19.

37.     Public filings following the Spin-Off confirm that LendingTree Parent assumed HLC's liabilities, including those relating to the LendingTree Loans and, specifically, repurchase and indemnification obligations.

38.     For example, in its 2008 10-K filing on February 27, 2009 (at page 50), LendingTree Parent stated that "[t]he historical consolidated financial statements of Tree.com and its subsidiaries reflect the contribution or other transfer of Tree.com of all the subsidiaries and assets and ***the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses*** in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses" (emphasis added).  A copy of the 2008 annual 10-K filing is attached as Exhibit 3.  Similar disclosures were included in other LendingTree Parent filings with the Securities and Exchange Commission ("SEC") through at least 2011.

39.     Moreover, in its 2011 annual 10-K filed April 16, 2012 (at page 81), LendingTree Parent stated:     "Tree.com will ***continue to be liable*** for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. . . .  We plan to negotiate with

secondary market purchasers to settle any then-existing and future contingent liabilities" (emphasis added).  *See also id.* at 11 ("We [defined as LendingTree Parent] will continue to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of our LendingTree Loans business to Discover.").  A copy of 2011 10-K filing is attached as Exhibit 4.

### C. <u>Defendants forced HLC to sell all of its operating assets but retained certain liabilities.</u>

40.    In connection with the sales of residential mortgage loans to secondary market purchasers, HLC would routinely make representations to those purchasers regarding, among other things, borrower credit information, loan documentation, and collateral.  The secondary market purchasers included LBHI's affiliates; those LBHI affiliates transferred the mortgage loans to LBHI and assigned to LBHI their rights vis-à-vis HLC under the applicable agreements.

41.    HLC's representations to purchasers were consistently false and subjected HLC to a significant number of repurchase demands.  Indeed, by early 2011, HLC was subject to a growing number of repurchase demands based on defective mortgage loans it had sold to secondary market purchasers.  As set forth in their own SEC filings, Defendants realized that they could be subject to significant liabilities in connection with the origination and sale of defective mortgage loans by HLC.

42.     In May 2011, LendingTree Parent, LendingTree Sub, and HLC entered into an asset purchase agreement ("APA") with Discover Bank.  Pursuant to the APA, HLC sold all of its operating assets to Discover for $55.9 million (the "Sale Proceeds").  The sale closed in June 2012 (the "2012 Sale").  $17.1 million of the $55.9 million Sale Proceeds were held in escrow "pending the resolution of certain actual and/or contingent liabilities that remain[ed] [LendingTree Parent's] responsibility following such sale."  A copy of the APA is attached as Exhibit 5.

43.     In the APA, Discover expressly disclaimed the assumption of pre-closing liabilities and repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans.  The APA provided that these "Excluded Liabilities" would "remain the sole responsibility of . . . Parent and its Affiliates (as applicable)," and defined the Excluded Liabilities as "every Liability of Parent and its Affiliates (including the Subsidiaries)," including the repurchase, warranty, and indemnification obligations associated with HLC's mortgage loans.  The APA defined the "Parent" as LendingTree Parent (then called Tree.com, Inc.).

44.     Since 2012, HLC has operated as a shell company and has not conducted any business.  It has no inventory, real property, equipment, or employees.  HLC substantially completed its "wind down" in or around the beginning of 2015, and since that time, its activities have been limited to disputing claims brought by plaintiffs concerning its defective mortgages, and occasionally

releasing legacy recorded interests on properties for which it had assigned away any interest in the applicable mortgage years ago.  Following the 2012 Sale, HLC's assets primarily consisted of the Sale Proceeds.  HLC's sole director, Lebda, was the CEO and Chairman of LendingTree Parent, which was the sole member of LendingTree Sub.

**D.   LBHI asserts claims for contractual indemnification against HLC.**

45.     By way of background, at all relevant times, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then sold the loans to third parties, including Fannie Mae, Freddie Mac, and RMBS trusts.

46.     At all relevant times, HLC engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

a.   The agreements governing HLC's relationship with LBB and LBHI.

47.     LBHI's claims for contractual indemnification arose out of HLC's sale of residential mortgage loans to LBHI's assignor, LBB, under on or more Loan Purchase Agreements with LBB (each a "LPA").[3]

48.     The LPAs specifically incorporated the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "Seller's Guide,"

---

[3] Although the language of certain agreements referenced in this Complaint (such as the LPAs and the Seller's Guide, as updated from time to time) may vary slightly, they were generally consistent in all material respects of relevance to the claims asserted by LBHI against HLC.

together with the LPAs, the "<u>Agreements</u>") which set forth additional duties and obligations of HLC.  The Seller's Guide in its entirety was valid and binding on HLC.

49.     The Agreements set forth the duties and obligations of the parties with respect to the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

50.     The Agreements also set forth HLC's duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold or submitted; and HLC's indemnification obligations.

51.     Pursuant to the Agreements, HLC sold Defective Loans to LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

52.     The parties agreed that HLC's obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI.  The Seller's Guide defined the "Purchaser" as LBB and, among others, its "successors and/or assigns." *See* Seller's Guide § 8.

53.     In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the Defective Loans.

54. Further, the Seller's Guide provided that LBHI, as a subsequent holder of any Mortgage Loan, "shall be a third party beneficiary" of the LPAs.

      b.   <u>HLC makes representations and warranties to LBB.</u>

55. Accordingly, LBHI as the "assignee" and third-party beneficiary of the LPAs, and as "subsequent holder" of the Defective Loans, was entitled to all the benefits of the Agreements, including the right to contractual indemnification.

56. With respect to each of the loans sold to LBHI (as, among other things, LBB's assignee) under the LPAs, HLC made a number of representations, warranties, and covenants concerning the quality, characteristics, and underwriting of the mortgage loans; the property securing the mortgage loans; and the borrowers.

57. Specific examples of HLC's representations, warranties and covenants included, but were not limited to, the following:

> No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading. Seller's Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and contractual requirements with respect to the origination, closing, underwriting, processing and

servicing of each Mortgage Loan . . . .   Seller's Guide §
703(8).

The documents, instruments and agreements submitted
for loan underwriting were not falsified and contain no
untrue statement of material fact or omit to state a
material fact required to be stated therein or necessary to
make the information and statements therein not
misleading.  No fraud was committed in connection with
the origination of the Mortgage Loan.  The Seller has
reviewed all of the documents constituting the Mortgage
Loan File and has made such inquiries as it deems
necessary to make and confirm the accuracy of the
representations set forth herein.  Seller's Guide § 703(12).

There is no default, breach, violation or event of
acceleration existing under the Mortgage or the Note and,
no event has occurred or condition exists that, with the
passage of time or with notice and the expiration of any
grace or cure period, would constitute a default, breach,
violation or event of acceleration and neither Seller nor its
predecessors has waived any default, breach, violation or
event of acceleration.  Seller's Guide § 703(18).

The Mortgage Loan has been originated and processed by
Seller or Seller's correspondent in accordance with, and
conforms with, the terms of this Seller's Guide and the
Loan Purchase Agreement, and the Mortgage Loan has
been underwritten in accordance with Underwriting
Guidelines in effect as of the date of the Delivery
Commitment applicable to the Mortgage Loan.    The
Mortgage Loan complies with all the requirements of the
related Program Profile applicable to such Mortgage Loan
. . . .  Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under
applicable law, unless properly disclosed to Purchaser.  All
inspections, licenses and certificates required to be made
or issued with respect to all occupied portions of the
Mortgaged Property, or with respect to the use and

occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable.  Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof.  The compensation of any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan.  Seller's Guide § 703(36).

58.    To the extent HLC was also the underwriter of certain loans as permitted under the Seller's Guide or other applicable agreements, HLC

additionally represented, warranted, and covenanted in Section 717(1) of the Seller's

Guide that with respect to such loans:

> All underwriting performed by Seller hereunder shall be in strict compliance with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

59.    HLC represented and/or warranted in Section 702(5) of the Seller's

Guide that it had the ability to perform its obligations under, and satisfy all

requirements of, the LPAs.

60.    LBHI (as, among other things, LBB's assignee) relied upon the

representations and warranties contained in the Agreements in purchasing the

Defective Loans.  Specifically, Section 701 of the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) Seller's compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

### c.   HLC owes indemnification obligation to LBHI under the LPAs.

61.    HLC agreed to indemnify LBHI (as, among other things, LBB's

assignee) from liabilities, claims, judgments, losses and expenses it might sustain

as a result of the Defective Loans, including attorneys' fees.  Section 711 of the

Seller's Guide, entitled "Indemnification and Third Party Claims," provides, in pertinent part, as follows:

> In addition to any repurchase and cure obligations of Seller . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation, any subsequent holder of any Note) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent. In addition to any and all other obligations of Seller hereunder, Seller agrees that it shall pay the reasonable attorney's fees of Purchaser incurred in enforcing Seller's obligations hereunder . . . .

    d. <u>LBHI settles its liabilities with Fannie Mae, Freddie Mac, and the RMBS trusts.</u>

62.    When LBB acquired loans from HLC and others, it typically did not hold those loans on its books.  The loans it acquired from HLC and other entities, including the Defective Loans, were sold to LBHI, and then sold to other industry participants, including Fannie Mae, Freddie Mac, and various RMBS trusts.

63.    When LBHI sold the Defective Loans to these entities, it relied on information provided to LBB by HLC, and LBHI itself made representations and warranties to Fannie Mae, Freddie Mac, and/or the RMBS trusts based, in part, on the representations HLC made to LBB.

64.     Eventually, Fannie Mae, Freddie Mac, and various RMBS trusts discovered breaches of representations, warranties, and/or covenants in the Defective Loans.

65.     Fannie Mae, Freddie Mac, and the RMBS trusts filed proofs of claim in LBHI's bankruptcy proceeding to recover for losses on the Defective Loans and other loans sold to LBB.

66.     Many of the loans at issue in the proofs of claims, and all of the Defective Loans, contained defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to Fannie Mae, Freddie Mac, and the RMBS trusts.

67.     LBHI was forced to defend against and eventually settle with Fannie Mae, Freddie Mac, and the RMBS trusts.

68.     The Bankruptcy Court approved LBHI's settlements, including loan-level damages amounts for each Defective Loan, finding the settlements to be "reasonable and appropriate."

69.     The types of defects which caused LBHI to incur expenses, costs, losses, judgments, attorneys' fees, and liability to Fannie Mae, Freddie Mac, and the RMBS trusts include but are not limited to defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, and the value and characteristics of the collateral, such as with respect to the income, employment,

assets, and debt obligations of the borrowers, the intended and actual occupancy status of the properties, the appraised value of the properties and compliance with appraisal standards, among other things; defects concerning underwriting and the collection and review of the loan application and supporting documentation; and defects concerning origination practices generally, including compliance with applicable laws, rules, regulations, decrees, pronouncements, directives, orders, and guidelines.

70.     The liability incurred by LBHI to Fannie Mae, Freddie Mac, and/or the RMBS trusts was the result of HLC's acts, failures, omissions, and breaches of its representations, warranties, obligations, and/or covenants, which representations, warranties, obligations, and/or covenants are co-extensive with the representations and warranties LBHI made to Fannie Mae, Freddie Mac, and the RMBS trusts.

> e.   <u>HLC was obligated to indemnify LBHI.</u>

71.     HLC agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees, and expenses it might sustain as a result of the Defective Loans.

72.     LBHI demanded that HLC indemnify LBHI for its share of LBHI's liability to Fannie Mae, Freddie Mac, and/or the RMBS trusts, which demands were refused by HLC in breach of is contractual indemnification obligations. Accordingly, LBHI filed an adversary proceeding against HLC in the Bankruptcy Court to recover the amounts owed by HLC to the LBHI estate.

**E.   HLC files for bankruptcy.**

73.     On June 21, 2019, the Court entered a judgement in favor of ResCap against HLC for $68,484,502.06.  On July 19, 2019, HLC filed a notice of appeal.  On July 21, 2019, HLC filed a chapter 11 petition in the Northern District of California.  *In re Home Loan Center, Inc.*, 5:19-bk-51455 (MEH).   HLC disclosed that it had approximately $11 million in assets.  Of that $11 million, about $5.4 million was cash.  The rest consisted of retainers paid to various restructuring professionals, an ownership interest in HLC Escrow, Inc., and certain tax attributes.

74.     On September 16, 2019, HLC's chapter 11 case was converted to a chapter 7 case, and the estate entered into liquidation.

75.     The United States Bankruptcy Court overseeing HLC's bankruptcy case is expected to enter an order allowing LBHI's claim in the amount of $13.3 million.  This Allowed Claim will have the same force and effect as a court judgment.

**F.   Defendants continue to recognize that they are responsible for HLC's liabilities.**

76.     At all relevant times, Defendants have represented to the public that they were responsible for HLC's liabilities.

77.     From 2011 to 2018, LendingTree Parent's annual filings with the SEC explicitly acknowledged its responsibility for HLC's liabilities.

78.     In its 2011 10-K (at 81), LendingTree Parent (then Tree.com, Inc.) stated: "Tree.com will continue to be liable for indemnification obligations, repurchase

obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. . . . We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities . . . ."

79.    In its 2013 10-K (at 8), LendingTree Parent disclosed that:  "[w]e continue to be liable for [HLC's] indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business [HLC]."  In the same filing, LendingTree Parent disclosed (at 29) estimates of "**our** exposure related to **our** obligation to repurchase loans previously sold to investors" and referenced its difficulties in estimating "**our** maximum exposure for breaches of the representations and warranties **LendingTree Loans** made to the investors" (emphasis added).  A copy of the 2013 10-K is attached as Exhibit 6.

80.    In its 2018 10-K, LendingTree Parent disclosed that ResCap had obtained a jury verdict of $28.7 million against HLC and that it was seeking both prejudgment interest and attorney fees.  LendingTree Parent stated (at 13):  "**We** have incurred substantial legal fees in this matter," and "[t]he ultimate outcome of the [ResCap Litigation] and the outcomes of other pending of indemnification claims, repurchase obligations or premium repayments beyond **our** reserves for these contingencies, including legal fees **we** incur, may have a material and adverse

effect on *our* business, financial condition and results of operations" (emphasis added).  LendingTree Parent also made a provision of $1 million for the claims asserted by LBHI on the consolidated balance sheet.  A copy of the 2018 10-K is attached as Exhibit 7.

81.     In its 2019 10-K, which was filed on July 25, 2019—four days after HLC's bankruptcy—LendingTree Parent (at 30) continued to estimate a liability of $1 million for LBHI's claims as of June 30, 2019.  LendingTree Parent also attributed (at 41) losses to its "LendingTree Loans business formerly operated by our [HLC] subsidiary."  And, LendingTree Parent disclosed (at 45) that HLC's creditors could assert claims "directly against *our* company [which] could result in losses to *us*" (emphasis added).  A copy of the 2019 10-Q is attached as Exhibit 8.

## COUNT ONE
## (DECLARATORY RELIEF AGAINST LENDINGTREE PARENT)

82.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 81 as if fully set forth herein.

83.     An actual controversy has arisen and now exists between LBHI and LendingTree Parent.  LBHI contends, but is informed and believes that LendingTree Parent denies, that LendingTree Parent is liable to LBHI for the amounts due under the Allowed Claim because it has expressly assumed HLC's repurchase and indemnification liabilities, including, specifically, the liabilities reflected in the Allowed Claim.

84.     The following facts (among other facts alleged above and to be developed in discovery) evidence LendingTree Parent's express agreement and acknowledgement that it has assumed responsibility for HLC's liabilities, including to LBHI:

a.  When Lending Tree Sub was spun off from IAC, LendingTree Parent (then Tree.com, Inc.) expressly agreed to assume all of HLC's liabilities related to "LendingTree Loans," which was HLC's dba.

b.  From 2008 to 2018, LendingTree Parent's filings with the SEC explicitly acknowledged responsibility for HLC's repurchase and indemnification liabilities.

c.  During the 2012 sale of HLC's assets to Discover, LendingTree Parent acknowledged that it was liable for repurchase, warranty, and indemnification obligations.

d.  Defendants guaranteed repurchase agreements and warehouse credit facilities between HLC and Citibank, and between HLC and Credit Suisse, which provided financing for HLC until the completion of the sale to Discover.  Upon information and belief, Defendants guaranteed HLC's agreements because they knew they were responsible for HLC's obligations.  Upon information and belief, Discover knew Defendants had guaranteed HLC's repurchase agreements and warehouse credit facilities,

and any reasonable purchaser would expect the reason for those guarantees was that Defendants were responsible for HLC's losses.

85.     LBHI seeks a judicial determination of the respective rights and duties of LBHI and LendingTree Parent with respect to the foregoing.  In particular, LBHI seeks a declaration that LendingTree Parent expressly assumed the liabilities of HLC and as such, LendingTree Parent is liable to LBHI for the amounts due under the Allowed Claim.  Such a declaration is necessary and appropriate at this time in order to ensure that LBHI may ascertain its rights with respect to the Allowed Claim.

## COUNT TWO
## (DECLARATORY RELIEF AGAINST LENDINGTREE SUB AND LENDINGTREE PARENT)

86.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 85 as if fully set forth herein.

87.     An actual controversy has arisen and now exists between LBHI and Defendants.  LBHI contends, but is informed and believes that Defendants deny, that each of the Defendants is liable to LBHI for the amounts due under the Allowed Claim because they are HLC's alter egos.

88.     There was such unity of interest between Defendants and HLC that their separate personalities did not in reality exist.  The unity of interest is demonstrated by the following facts (among other facts alleged above and to be developed in discovery):

a.  LendingTree Parent wholly owns LendingTree Sub, which wholly owns HLC.  Lebda, who is the founder, chairman of the board, chief executive officer, and stockholder of LendingTree Parent, is the sole manager of LendingTree Sub and until February 2019, was the sole director of HLC.

b.  Defendants and HLC all operated at the same address—11115 Rushmore Drive, Charlotte, North Carolina 28277.

c.  Defendants branded HLC as "LendingTree Loans" and integrated it into LendingTree's online exchange platform.  That is because, on information and belief, HLC's lending platform was an integral part of Defendants' business strategy of creating competition and making loans on LendingTree's exchange platform.  Nearly all of HLC's loans were originated using leads generated from the LendingTree network.

d.  Defendants represented in numerous filings with the SEC that they were liable for HLC's repurchase and indemnification obligations.

e.  Defendants guaranteed debts vital to HLC's mortgage business—the credit warehousing facilities that allowed HLC to remain in operation.

f.  Defendants manipulated HLC's assets and liabilities, ensuring that HLC was undercapitalized at all times so that they would not have to own up for their wrongdoing.  Defendants ensured that HLC lacked sufficient capital to hold onto loans for more than 30 days.

89.     It would be inequitable if the acts of HLC are treated as those of HLC alone.   That is because if the acts of HLC are treated as those of HLC alone, Defendants will have been allowed to abuse the corporate form to funnel funds out of HLC to try and insulate themselves from liability.

90.     LBHI seeks a judicial determination of the respective rights and duties of LBHI and the Defendants with respect to the foregoing.   In particular, LBHI seeks a declaration that each of the Defendants is liable to LBHI for the amounts due under the Allowed Claim.   Such a declaration is necessary and appropriate at this time in order to ensure that LBHI may ascertain its rights with respect to the Allowed Claim.

## COUNT THREE
## (DECLARATORY RELIEF AGAINST LENDINGTREE SUB AND LENDINGTREE PARENT)

91.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 90 as if fully set forth herein.

92.     An actual controversy has arisen and now exists between LBHI and Defendants.   LBHI contends, but is informed and believes that Defendants deny, that each of the Defendants is liable to LBHI for the amounts due under the Allowed Claim because (i) Defendants were each principals who dominated and controlled their agent, HLC; (ii) HLC was acting within the scope of its agency when it sold the Defective Loans to LBB; and (iii) Defendants represented to the world that they were

liable for repurchase and indemnification obligations based on contracts entered into by their agent, HLC.

93.     After LendingTree Sub (then LendingTree, Inc.) acquired HLC, it operated its own lending business, which consisted of originating loans and selling those loans to secondary market purchasers, including to LBHI's assignor, LBB, through HLC.

94.     On information and belief, Defendants controlled every aspect of HLC's business, exploited HLC for its own gain, and caused HLC to originate loans and sell them to purchasers in the secondary market, including to LBHI's assignor, LBB.

95.     Defendants' domination and exploitation of HLC is demonstrated by the following facts (among other facts alleged above and to be developed in discovery):

a.  Defendants caused HLC to operate under the brand name "LendingTree Loans."

b.  HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans."

c.  "LendingTree Loans" were primarily sourced from consumer loan requests received by LendingTree websites and phone platforms.

d.  Most of HLC's customer leads were generated by the LendingTree network.

e.  LendingTree Sub, at the direction of LendingTree Parent, funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.

f.  Defendants would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days.

96.  As alleged above, Defendants announced publicly on numerous occasions that HLC was their agent and was acting within the scope its agency when it originated and sold loans to purchasers in the secondary market, including LBB. As alleged above, Defendants marketed HLC as their agent to prospective customers and secondary market purchasers.

97.  LBHI seeks a judicial determination of the respective rights and duties of LBHI and the Defendants with respect to the foregoing.  In particular, LBHI seeks a declaration that each of the Defendants is liable, as HLC's principal, to LBHI for the amounts due under the Allowed Claim.  Such a declaration is necessary and appropriate at this time in order to ensure that LBHI may ascertain its rights with respect to the Allowed Claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against the

Defendants as follows:

(A)     A declaratory judgment that Defendants assumed HLC's indemnification liabilities, including the liabilities to LBHI that were fixed in the Allowed Claim;

(B)     A declaratory judgment that Defendants are responsible to pay the Allowed Claim as HLC's alter egos;

(C)     A declaratory judgment that Defendants are liable for HLC's indemnification liabilities, specifically the liabilities to LBHI that were fixed in the Allowed Claim, as the principals of their agent, HLC, which was acting within the scope of its agency when it sold defective mortgage loans to LBB, and because Defendants caused the world to believe they were liable for such repurchase and indemnification liabilities.

(D)     An award of attorneys' fees, interest, and costs to the fullest extent permitted by law; and

(E)     All such further relief as the Court deems necessary or proper.

Dated:  June 11, 2020            GREENE ESPEL PLLP

 s/John B. Orenstein
John B. Orenstein, Reg. No. 020903X
Matthew D. Forsgren, Reg. No. 0246694
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
jorenstein@greeneespel.com
mforsgren@greeneespel.com
(612) 373-0830


WOLLMUTH MAHER & DEUTSCH LLP

William  A.  Maher (*pro  hac  vice
application forthcoming*)
James N. Lawlor (*pro hac vice application
forthcoming*)
Adam M. Bialek (*pro hac vice application
forthcoming*)
Brant D. Kuehn (*pro hac vice application
forthcoming*)
Brad J. Axelrod (*pro hac vice application
forthcoming*)
500 Fifth Avenue
New York, NY 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-3300
wmaher@wmd-law.com
jlawlor@wmd-law.com
abialek@wmd-law.com
bkuehn@wmd-law.com
baxelrod@wmd-law.com

*Attorneys for Lehman Brothers Holdings Inc.*